**UNITED STATES of America,**
**Appellee,**

v.

**Ramon HERNANDEZ, Defendant-**
**Appellant.**

**No. 181, Docket 25604.**

United States Court of Appeals
Second Circuit.

Petitions filed Sept. 7, 8, 1960.

Decided Feb. 14, 1961.

Leonard P. Moore, Circuit Judge, dissented in part.

S. Hazard Gillespie, Jr., U. S. Atty., S.D.N.Y., and George I. Gordon and Kevin Thomas Duffy, Asst. U. S. Attys., New York City, for petitioner United States.

David F. Dobbins, New York City, for petitioner Ramon Hernandez.

Before CLARK, WATERMAN, and MOORE, Circuit Judges.

CLARK, Circuit Judge.

The United States and the defendant-appellant both petition for rehearing of our decision of August 24, 1960, 2 Cir., 282 F.2d 71, reversing defendant's conviction of violation of the narcotics laws and remanding the case for a new trial. Our decision was based on the trial court's refusal to inspect the minutes of the grand jury testimony of Agent Newkirk, the Government's principal witness at the trial. The Government asserts that the trial court was not required to make the requested inspection because the defense counsel did not first point out a possible inconsistency between trial and grand jury testimony. Alternatively it contends that the refusal to inspect constituted harmless error. In its cross-petition defendant-appellant seeks a clarification of the applicable rule regarding the presumption arising from possession of narcotics in a prosecution under 21 U.S.C. § 174. While we adhere to our decision we think a fuller explanation desirable and shall proceed to make it in discussing the points made by the respective petitioners.

■ *The Government's petition.* The prosecution asserts that this court failed to apply properly the rule stated in United States v. Zborowski, 2 Cir., 271 F.2d 661, 665, thus: "The rule is that when the defendant points out a possible inconsistency between the trial and the grand jury testimony of a government witness and requests the trial judge to examine the witness' grand jury minutes, the trial judge must then read the minutes *in camera.*" And it contends that this rule requires an affirmative showing by the defendant of a possible inconsistency before the trial court may honor his request and inspect the minutes. But in that very case we held otherwise, as Circuit (now Chief) Judge Lumbard pointed out, 2 Cir., 271 F.2d 661, 666:

"Even if there were no showing of possible inconsistency in the testimony of a witness in a perjury case, or indeed in any case, where the testimony of such witness is the only direct evidence against the defendant and no valid reason for secrecy exists, the court should upon request examine the grand jury minutes of such a witness for possible inconsistencies. United States v. Spangelet, supra [2 Cir., 1958, 258 F.2d 338]. The reason for the necessity of such a rule is obvious. See Jencks v. United States, 1957, 353 U.S. 657, 667–668, 77 S.Ct. 1007, 1 L.Ed.2d 1103; Pittsburgh Plate Glass Co. v. United States, 1959, 360 U.S. 395, 407–410, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (dissenting opinion). Surely the defendant should have access to all conflicting testimony given under oath by the one direct witness who gives him the lie. It offends all sense of fairness to first require a showing of possible inconsistency preliminary to examination of the minutes by the trial judge."

The contrary is also made clear in our decision at the same time in United States v. McKeever, 2 Cir., 271 F.2d 669, 672, note 1, where we stated: " * * * the trial judge's examination of the minutes, without requiring a showing of possible inconsistency, was the proper and desirable course." Occasional dicta may appear to suggest lack of indicated inconsistencies as additional makeweights to decision, but we have never enforced such a self-defeating condition to destroy the usefulness of this important tool of cross-examination. For neither defendant nor his counsel has the grand jury minutes (indeed the request would not be made if they had them at hand); and to require a bill of particulars in support of the request when from

the nature of the situation counsel cannot know such details is to deny the rule itself. That we have not done. United States v. Spangelet, 2 Cir., 258 F.2d 338, 342; United States v. Tomaiolo, 2 Cir., 280 F.2d 411; United States v. Giampa, 2 Cir., 1961, 290 F.2d 83.

█ The Government also argues that this court should make an independent study of the grand jury minutes to determine whether or not any inconsistencies exist. It argues that no inconsistencies of consequence will be found, and that the error below can then be dismissed as harmless error. We are referred to United States v. Kirby, 2 Cir., 273 F.2d 956, where the trial court failed to inspect the grand jury minutes and this court nevertheless affirmed the conviction. True, we there examined the minutes contained in the record on appeal and stated that we found no inconsistencies. But the ground of our decision was the defendant's abandonment of his demand for inspection after the Assistant United States Attorney said they were not available. And by so examining the minutes which had been unavailable at the time of trial, we did not purport to sanction a procedure whereby the trial court could refuse to inspect minutes which were at hand. Moreover, that was a case of trial to the court, as was the situation in the more recent case of United States v. Santore, 2 Cir., Oct. 2, 1959, 290 F.2d 51, where the appellate panel asked the trial court for a later review and report.[1] The proper time for inspection is at trial, when any inconsistencies discovered may be used for cross-examination. A complete failure by the trial court to inspect the minutes of grand jury testimony by the Government's major witness cannot be remedied by inspection by the appellate court, at least in a jury case, where the possible effect of a searching cross-examination cannot be appraised as perhaps it may be by a trial judge sitting alone. The doctrine of harmless error cannot be extended so far if the announced rule is to re-

tain any vitality whatsoever. We deny the Government's petition for rehearing.

█ *Petition of the defendant-appellant.* The cross-petition seeks clarification of the question whether or not possession of narcotics by the alleged co-conspirators is sufficient to permit application to appellant of the presumption of guilt which 21 U.S.C. § 174 raises upon proof of possession. That important statute makes it a crime to receive, conceal, buy, or sell any narcotic drug which the defendant knows was illegally imported into the United States. It also punishes any person who, with knowledge of the illegal importation, conspires to commit the above crime or facilitates it. In United States v. Santore, 2 Cir., Nov. 16, 1960, 290 F.2d 51, a majority of this court on a rehearing *in banc* held that a defendant could be convicted for aiding and abetting, 18 U.S.C. § 2, the commission of the crime defined in 21 U.S.C. § 174. Since an aider and abettor must have the same knowledge and intent required of the principal, however, proof of knowledge of illegal importation is also necessary to a conviction for aiding and abetting. This is pointed out in the opinions of Judges Waterman and Friendly in the Santore case, supra.

█ Instead of proving the separate elements of 21 U.S.C. § 174, including knowledge of importation, the prosecution may take advantage of the statutory presumption stated in the statute thus: "Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of the narcotic drug, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury." Thus a person who facilitates, aids or abets, or conspires in violation of 21 U.S.C. § 174, and who can be shown to have had possession of the drug, can be convicted without independent proof of knowledge of illegal importation. The difficult problem presented in the present case is the meaning of "possession."

[1]. This point was not adverted to in the opinions *in banc*, Nov. 16, 1960, 2 Cir.,

290 F.2d 51. See also United States v. Giampa, 2 Cir., 1961, 290 F.2d 83.

It is well established that possession can exist without physical contact so long as the defendant has dominion and control over the drug. United States v. Cox, 2 Cir., 277 F.2d 302, 303. Such dominion and control without physical custody has been termed "constructive," as opposed to actual, possession. Physical custody by an employee or agent whom one dominates, or whose actions one can control, is sufficient to constitute such constructive possession by the principal. United States v. Maroy, 7 Cir., 248 F.2d 663, certiorari denied 355 U.S. 931, 78 S.Ct. 412, 2 L.Ed.2d 414. Moreover, a person who is sufficiently associated with the persons having physical custody so that he is able, without difficulty, to cause the drug to be produced for a customer can also be found by a jury to have dominion and control over the drug, and therefore possession. Cellino v. United States, 9 Cir., 276 F.2d 941; United States v. Malfi, 3 Cir., 264 F.2d 147, certiorari denied Malfi v. United States, 361 U.S. 817, 80 S.Ct. 57, 4 L.Ed.2d 63; United States v. Moia, 2 Cir., 251 F.2d 255; cf. Gallegos v. United States, 10 Cir., 237 F.2d 694. On the other hand, the casual facilitator who knows that a given principal peddles narcotics, but who does not have a working relationship with that principal which would enable him to assure delivery, lacks dominion and control and does not have possession.

Possession, actual or constructive, must be shown with respect to each individual conspirator, facilitator, or aider and abettor. Possession by another defendant by itself is not sufficient. See United States v. Santore, supra, 2 Cir., Nov. 16, 1960, 290 F.2d 51, opinions by Judges Waterman and Friendly. It is true that three of the six members of the court in the Santore case held the contrary view that possession by a codefendant was sufficient to sustain conviction of an aider and abettor, even though the latter did not have actual or constructive possession. But since it was not a majority view, it cannot be taken as the law governing the retrial of this case unless perchance the Supreme Court meanwhile has spoken and so held. Admittedly we cannot foretell the eventual development of the law, but it does not seem amiss to suggest to the trial judge the obvious precaution that he avoid a charge based on legal principles held erroneous by half our appellate bench.

From the recital in our original opinion of Agent Newkirk's testimony at the trial, it appears that defendant did not have physical possession of the narcotics, but introduced Newkirk to Lopez —"one of his partners or his supplier" —and Lopez took Newkirk to Fanfan, who made the actual sale. Thus the question of constructive possession by defendant became all-important. Since the charge did not go beyond the general language of the statute, or define or explain the meaning of possession, a remand for a new trial is also required on this ground as well as on the refusal to inspect the grand jury minutes. The Government urged that the conviction be affirmed on an alternative theory treating defendant as an aider or abettor of the actual possessor; but that was not even mentioned in the charge, and hence is in no event available to sustain this verdict. Pereira v. United States, 347 U.S. 1, 10, 74 S.Ct. 358, 98 L.Ed. 435; Nye & Nissen v. United States, 336 U.S. 613, 620, 69 S.Ct. 766, 93 L.Ed. 919.

We yield to no one in our horror at the evils of the narcotics trade. Nevertheless we feel that law enforcement, here as in all cases, must be in accordance with American legal principles and, in any event, must not go beyond Congressional directives. Moreover, suppression of the narcotics trade can hardly turn uniquely on extension of the unusual presumption accorded the Government in 21 U.S.C. § 174, for the Government has at hand many other statutory prohibitions under which it may proceed. See, e. g., 26 U.S.C. §§ 4704, 4705, and 7237; Papalardo v. United States, 6 Cir., 218 F.2d 694, certiorari denied 349 U.S. 920, 75 S.Ct. 659, 99 L.Ed. 1252. We know of no reason why all narcotics prosecutions should be based on this one statute when

legal conflicts may be avoided by prosecution under other statutes.

The conviction must therefore be reversed and the action remanded for a new trial where the jury should be charged in accordance with the above opinion. The defendant's petition for rehearing is therefore, after consideration, also denied.

LEONARD P. MOORE, Circuit Judge (concurring in part; dissenting in part).

To understand the difficulties (and the attendant delays) presented in this case, the factual background must be reviewed.

On July 17, 1958, Hernandez, with defendants, Fanfan and John Doe (alias Pepe, alias Choca) were indicted in a two-count indictment (I) for receiving, concealing, selling and facilitating the transportation, concealment and sale of 140 grains of heroin "after the said narcotic drug had been imported and brought into the United States contrary to law, knowing that the said narcotic drug had theretofore been imported and brought into the United States contrary to law * * *" (21 U.S.C.A. §§ 173, 174); and (II) for a conspiracy to violate Sections 173 and 174. "John Doe" pleaded guilty before trial. Hernandez and Fanfan were tried before a jury and convicted on both counts on September 25, 1958.

The insufficiency of the government's proof to establish that Hernandez had possession or control of a narcotic drug or that he knew that it was imported was directly before us upon the appeal. A second important point of error was raised, namely, the trial court's refusal to inspect for possible inconsistencies the Grand Jury minutes of testimony given by the government's principal witness. Hernandez' counsel, with conceded awareness of the government's difficulty of obtaining affirmative proof as to the source of the narcotics because of the very nature of the illicit traffic therein, with persuasive reasoning advanced the theory that to overcome this proof problem Congress created the limited presumption of knowledge from the basic fact of possession and that it is not too great a burden to place on a possessor the burden of explanation because the possessor should know where he obtained the drug. As an additional reason for the limitation of the presumption to possessors, counsel pointed out a possible constitutional objection, were the presumption not so construed, because of the doctrine that there be some rational connection between the presumed fact and the basic fact (Tot v. United States, 1943, 319 U.S. 463, 63 S.Ct. 1241, 87 L.Ed. 1519; Morrison v. People of State of California, 1934, 291 U.S. 82, 54 S.Ct. 281, 78 L.Ed. 664; Constitutionality of Rebuttable Presumptions, 55 Col.L.Rev. 527, 530 (1955)).

In brief and in argument on the possession presumption point, Hernandez' counsel relied primarily on our then just announced decision in United States v. Santore et al., 290 F.2d 51. In that case, the conviction of Santore on Count Two was reversed because two members of the panel believed that there was insufficient proof that Santore "had a voice in deciding, or could control, what was to be done with the narcotics" and that he "functioned only as an intermediary between the agents, as purchasers, and Casella and his partners, as sellers." This, the majority held, was inadequate to support the conviction "absent physical custody of the drugs" or that "he exercised that type of control over them and their disposition which we hold constitutes possession." United States v. Landry, 7 Cir., 1958, 257 F.2d 425, was also cited.

The government in Santore applied for a rehearing in banc which by a divided court was granted (March 9, 1960). Reargument was heard on March 16, 1960, by the five then-active Judges (Judge Smith became a member of the Court on September 14, 1960, and considered the case on the record and briefs).

Pending determination of Santore and on August 24, 1960, we filed our opinion in Hernandez. Because of the error in not examining the Grand Jury minutes, the conviction was reversed (Per Curi-

am) and the case remanded for a new trial (United States v. Hernandez, 2 Cir., 1960, 282 F.2d 71). The possession presumption issue was not discussed because it was hopefully expected that by the time Hernandez was reached for retrial some decision would have been announced either by the *in banc* court in Santore or by some Supreme Court action on the certiorari petitions filed by other defendants in the Santore case.

On September 7, 1960, and prior to any decision in Santore by the *in banc* court, counsel for Hernandez filed a petition for rehearing and reconsideration of the decision in which he quite properly and accurately pointed out that any retrial might be "an exercise in great uncertainty" and that "without instructions from this Court as to how to apply the law to those facts at a retrial of the case, the trial court will be placed in a situation of having to guess, at appellant's [Hernandez'] peril, what exactly the state of the law in this Circuit is as to establishing the requisite proof of entitling the prosecution to use the statutory presumption in 21 U.S.C. § 174" (Pet. for Rehearing). Because of the bearing that a decision in Santore would have on Hernandez, his counsel requested us not to return the case to the district court for retrial until Santore was decided. We acceded to that request.

On November 16, 1960, the *in banc* court filed four opinions. The effect of the presumption (21 U.S.C. § 174) was the primary issue in Count II of the indictment against Santore and Lo Piccolo charging a sale of heroin on December 11, 1957. They had been convicted upon the trial. Upon appeal, Santore's conviction on Count II was reversed by a divided court (Judge Hand and Judge Waterman voting for reversal, Judge Byers [1] voting for affirmance). In substance the majority held that, despite the fact that the purchaser gave the purchase price ($6,000) to Santore, he "functioned only as an intermediary" and that, although he "was, without question, an ac-

tive member in the criminal conspiracy," nevertheless that membership "was not such that, absent physical custody of the drugs, he exercised that type of control over them and their disposition which we hold constitutes possession" (290 F.2d 51). Lo Piccolo's conviction on Count II was also reversed because the majority believed that his conviction would be sustained "only if we find that he had possession of the drugs" and because, in their opinion, there was no evidence of control or possession.

However, this result was changed by the decision of the *in banc* court which affirmed the original convictions of Santore and Lo Piccolo on Count II. The facts relied upon in the opinion written by Chief Judge Lumbard showed that Lo Piccolo had "constructive possession" of heroin and that Santore actively assisted, aided and abetted in the heroin sale. The issue was clearly stated: "The question that now presents itself is whether, in order to convict one who purposefully aids and abets others in the sale of narcotics which he knows they possess, it is necessary to show either that he personally had physical or constructive possession of the drugs or that he knew they had been imported." Three Judges (Chief Judge Lumbard and Judges Smith and Moore) held "that such proof is not necessary." In a separate opinion, Judge Smith wrote that "the possession of one should be attributed to the other and the presumption brought into play, both in the establishment of the necessary *scienter* on the conspiracy count and on the substantive counts."

Judge Waterman's disagreement, with which Judge Clark concurred, is succinctly summarized in his statement that "Thus under 21 U.S.C. § 174 personal possession, whether physical or otherwise, is as essential to the conviction of an offending aider and abettor as it is to the conviction as a principal of one who commits a specific offense." Judge Friendly found the evidence sufficient to justify affirmance of the Santore and Lo

[1]. United States District Judge for the Eastern District of New York sitting by designation.

Piccolo convictions under Count II but differed with the affirming opinion on the subject of the effect of the presumption on one who might aid and abet (18 U.S.C. § 2).

This, in essence, is the background against which the present majority opinion in Hernandez must be viewed. Despite the fact that the trial judge in Santore was affirmed in his holding that the evidence was sufficient to support convictions of Santore and Lo Piccolo on Count II, the majority now would overturn the Santore decision by holding that "Possession, actual or constructive, must be shown with respect to each individual conspirator, facilitator, or aider and abettor. Possession by another defendant by itself is not sufficient." They concede that three active members of this court "held the contrary view that possession by a codefendant was sufficient to sustain conviction of an aider and abettor, even though the latter did not have actual or constructive possession." They say that the opinion of the three judges in Santore which sufficed to affirm the trial judge was "not a majority view" and "cannot be taken as the law governing the retrial of this case unless perchance the Supreme Court meanwhile has spoken and so held." In an endeavor to insure that their views will prevail in the future, they reverse and remand "for a new trial where the jury should be charged in accordance with the above opinion."

Presiding upon the retrial and faced with this dilemma, what is the hapless trial judge to do? If he rules or charges a jury in accordance with the opinions of Chief Judge Lumbard and Judge Smith in Santore, Judge Moore concurring, he may have every expectation of believing that he has correctly ruled, provided, however, the appeal is heard by a panel upon which are two of the three Judges who concur in this view. If by chance two of the three having contrary views are sitting, a reversal might be likely. But even here this result would not obtain were Chief Judge Lumbard not disqualified to participate. As in Santore, an *in banc* court by a three-to-three vote would affirm on the possession presumption point and no contrary instructions would issue. If this seeming impasse is not cured by legislation or Supreme Court resolution of the problem, every narcotics case in this Circuit in which the possession presumption point were involved, if submitted *in banc* would follow the pattern of Santore. By such means would trial judges be assured that they could with some degree of assurance and safety follow the principles believed by Judges Lumbard, Smith and Moore to be the law.

Probably in no other district in the country is the problem here presented more frequently encountered than in the Southern District of New York (see Appendix). The vast volume of shipping in the Port of New York area is accountable for and facilitates the importation of narcotic drugs for distribution, sale and use in New York and inland cities. Despite the efforts of the Federal Narcotics Bureau the traffic flourishes. Recent prosecutions [2] of giant "rings" disclose the nationwide scope of their activities. As is not unnatural in a business so illicit, sales and deliveries of heroin are not carried on over the counter in broad daylight. The devious maneuvers, first to negotiate the sale and then to effect delivery, are varied, imaginative and worthy of the best detective story authors. Anomalously enough, possession, kept undercover as long as possible, seems to be entrusted to minor characters. Starting with the seaman who for a small fee brings the "stuff" from the ship, the drug remains fairly well in hiding until ready for sale, cutting and retail. Very rarely does the negotiator of the sale have possession. Mysterious meetings and telephone calls between several dif-

---

**2.** United States v. Aviles, 2 Cir., 1960, 274 F.2d 179, certiorari denied sub nom. Genovese v. United States, 1960, 362 U.S. 974, 80 S.Ct. 1059, 4 L.Ed.2d 1010;

United States v. Stromberg, 2 Cir., 1959, 268 F.2d 256, certiorari denied 1959, 361 U.S. 863, 80 S.Ct. 123, 4 L.Ed.2d 102; United States v. Santore et al., supra.

ferent persons are usually necessary before there is a disclosure that the package may be found behind a radiator in an apartment house,[3] in a hotel room,[4] in the trunk of an automobile,[5] or in the hollow of a tree.[6]

To effect delivery, runners frequently are used (generally for small fees). Such persons have little, if any, knowledge of the network which is guiding and controlling the traffic. However, one fact emerges as certain, namely, that a long chain of links, each of which aids and abets, facilitates, acts as an agent, participates or as the statutes say "conspires," is tightly enough forged to support a flourishing business. In looking at such a picture realistically, the nomenclature of the role of each participant is pure semanticism. The words "constructive possession" or "control" or "type of control" have no subjective meaning. And if the actual possessor of the drug is to be the only person endowed by law with knowledge of importation and hence subject to conviction, enforcement will be limited to those seamen who laden with their cargo waddle down piers or delivery boys who haven't the slightest idea where the "stuff" comes from.

For some years, Congress has focused its attention on the narcotics evil. Lenghy reports have been issued. The facts and conclusions therein (summarized incompletely in an appendix hereto) would justify the enactment of measures most effective to prevent heroin from reaching, or often from being in effect forced upon, unfortunate addicts or potential victims. Yet the presumption created by statute in 1866 (applied to opium and opium derivatives in 1909 and to all narcotic drugs in 1922)[7] remains in virtually the same language today. To be sure, Congress has enacted minimum sentences, largely to counteract a tendency by some judges, who regard all narcotics traffickers as persons afflicted with a disease, to impose trifling and ineffectual sentences. Little, if anything, however, has been done to enact a modern-day enforcement code, fair to prosecutor and accused alike which is realistic in the light of modern-day practices. The narcotics dealers are not unmindful of the advances made between 1866 and 1961, particularly in science and transportation, and their usefulness in their business. However, the statute with its meaningless and archaic presumption remains the same.

In 1941 this court in United States v. Cohen, 2 Cir., 1941, 124 F.2d 164, certiorari denied Bernstein v. United States, 315 U.S. 811, 62 S.Ct. 796, 86 L.Ed. 1210 sub nom., rehearing denied 1942, 316 U.S. 707, 62 S.Ct. 941, 86 L.Ed. 1774, affirmed the conviction of Cohen, indicted for violating 21 U.S.C. § 174. Referring to the effect of the aiding and abetting statute upon defendants charged with such violation, the court said:

" * * * under the second statute [18 U.S.C.A. § 550, now 18 U.S.C.A. § 2], making an abettor a principal, it was not necessary that each of the defendants should have had the narcotics, but only that one or more of them had possession while the others aided in the illicit transaction to which that possession was incidental" 124 F.2d at page 165.

"We can see no lack of proof as against any of the defendants. They all seem to have been thoroughly implicated in committing or in aiding and abetting in the commission of the offenses charged" 124 F.2d at page 166.

During recent years this court has relied upon these principles as set forth in the Cohen case. In 1955 in the La Rocca case, supra, although payment was made to La Rocca, he did not have possession

---

3. United States v. La Rocca, 2 Cir., 1955, 224 F.2d 859.

4. United States v. Santore et al., 1958, 290 F.2d 51.

5. Ibid.

6. Brown v. United States, 9 Cir., 1955, 222 F.2d 293.

7. See 14 Stat. 179 (1866); 35 Stat. 614 (1909); 42 Stat. 596 (1922).

and only arranged delivery by having the purchaser obtain the heroin through information supplied by a third person. In 1958 Moia's conviction was affirmed [8] upon facts which showed neither possession, receipt of purchase price, nor delivery. Moia merely received the orders over the telephone. Delivery and payment were handled by a co-defendant. The court upheld a charge defining an aider and abettor as "one who assists in the commission of a crime." In 1960 Cox [9] argued that the government had not proved possession and, hence, no knowledge of unlawful importation, but we held that there was adequate evidence of his power to determine custody.

Other circuits have followed the Cohen case doctrine: United States v. Chiarelli, 7 Cir., 1951, 192 F.2d 528, certiorari denied 342 U.S. 913, 72 S.Ct. 359, 96 L.Ed. 683, rehearing denied 1952, 342 U.S. 950, 72 S.Ct. 551, 96 L.Ed. 706; Brown v. United States, 9 Cir., 1955, 222 F.2d 293; Alexander v. United States, 8 Cir., 1957, 241 F.2d 351, certiorari denied 354 U.S. 940, 77 S.Ct. 1405, 1 L.Ed.2d 1539, rehearing denied 1957, 355 U.S. 852, 78 S.Ct. 78, 2 L.Ed.2d 61; United States v. Maroy, 7 Cir., 1957, 248 F.2d 663, certiorari denied 1958, 355 U.S. 931, 78 S.Ct. 412, 2 L.Ed.2d 414; United States v. Malfi, 3 Cir., 1959, 264 F.2d 147, certiorari denied 1959, 361 U.S. 817, 80 S.Ct. 57, 4 L.Ed.2d 63; Cellino v. United States, 9 Cir., 1960, 276 F.2d 941.

In United States v. Landry, 7 Cir., 1958, 257 F.2d 425, the Seventh Circuit seemed more interested in discussing the difference between "possession" and "ownership." The heroin was assumed to be owned by Landry but possessed by a third party. The court said that "ownership is not proof of possession any more than possession is proof of ownership" (at page 431) and chose not to apply the presumption to ownership. This is hardly a repudiation of the Cohen doctrine followed by them in Chiarelli and Maroy.

Turning briefly to the facts we find that Hernandez was approached by a narcotics agent who said he was interested in purchasing heroin. Hernandez quoted his price and agreed to obtain the quantity desired. He then proceeded to make arrangements for delivery through a third person, Lopez, whom he described as "one of his partners or his supplier." Lopez, present with Hernandez, then left "to arrange for the delivery of a half-ounce of heroin to me [the agent] for $75.00" (the price agreed upon between Hernandez and the agent). Lopez upon his return checked with Hernandez as to his customer (the agent). The agent and Lopez left and walked a short distance until they met a fourth person, Fanfan, who upon being told by Lopez that the agent "was the guy who wanted to get the stuff," produced the heroin and delivered it to the agent.

The pattern of this transaction is not unlike the routine found in the cited cases, namely, the sale negotiated and the price fixed by the seller (here Hernandez) and the delivery made by others in a manner, if not directly, at least by fair inference controlled by the seller.

Since this case must be remanded in any event because of the failure to inspect the Grand Jury minutes, my dissent is limited to that portion of the majority opinion which relates to the possession presumption point.

APPENDIX A

A. *The Illicit Narcotics Traffic, Report of the Committee on the Judiciary, United States Senate, Summary of Preliminary Findings and Recommendations of the Subcommittee on Improvements in the Federal Criminal Code, 84th Congress 2d Session, Senate Report 1440 (1956):*

1. "The United States has more narcotic addicts, both in total numbers and populationwise, than any other country in the Western World."

---

8. United States v. Moia, 2 Cir., 1958, 251 F.2d 255, 258.

9. United States v. Cox, 2 Cir., 1960, 277 F.2d 302.

a) At least 60,000 addicts in the United States.

b) Federal Bureau of Narcotics has names of 30,000 addicts, new names being reported at rate of 1,000 per month. 13 percent are less than 21 years of age.

c) The United States probably has more addicts than all Western nations combined.

2. "The illicit drug traffic has trebled in the United States since World War II."

a) Ratio has changed from 1 in 10,000 to 1 in 3,000.

b) 2,000 persons arrested each month on narcotics charges.

c) Traffic now costs over $500,-000,000 per year.

3. "Drug addiction is responsible for approximately 50 percent of all crimes committed in the largest metropolitan areas and 25 percent of all crimes in the nation."

a) 90 percent of traffic concentrated in 43 of nation's most populous cities.

b) Addicts are responsible for a large majority of burglaries, thefts, prostitution and other offenses.

4. "Drug addiction is contagious. Addicts spread the habit with cancerous rapidity to their families and associates."

a) 90 percent of the addicts appearing before subcommittee began using drugs because of "friends" and "associates."

b) Less than 20 percent of known addicts are now confined.

5. "The United States faces problem of thriving international traffic in narcotic drugs. Red China, Turkey, Lebanon and Mexico are the primary sources of heroin reaching the United States, and international controls are inadequate."

a) Actual scientific and medical need for opium is 500 tons annually; total world production is 12,000 tons.

6. "Recent seizures of heroin and cocaine in record quantities point up the international smuggling operation with the United States as a target."

7. "Subversion through drug addiction is an established aim of Communist China. Since World War II, Red China has pushed exportation of heroin to servicemen and civilians of the United States and other free nations of the world."

a) "The United States is one of the principal targets of this vicious illicit traffic in drugs as the Peiping regime seeks (1) to obtain dollars to purchase strategic materials and to pay foreign operatives and (2) to demoralize susceptible individuals in our military services and in the general population."

8. "Criminal laws and procedures are insufficient to insure the apprehension and punishment of narcotic offenders."

a) Judicial interpretations of constitutional search and seizure safeguards, wiretapping restrictions, granting of low bail bonds and limitations on federal narcotic agents are partly responsible.

9. "Penalties for narcotic violations are neither commensurate with the seriousness of the crime nor sufficient to remove the profits."

B. *Narcotic Control Act of 1956, Report of the Committee on Ways and Means, House of Rep., House Report 2388, 84th Congress, 2d Session (1956):*

1. "Enforcement officers have reported certain weaknesses in present laws and have called to the attention of your subcommittee certain court decisions which have tended to vitiate the effectiveness of existing Federal enforcement legislation."

2. "In 1948 an upsurge in addiction and an outbreak of teen-age use of narcotic drugs occurred. By 1950, narcotic addiction approached grave proportions in certain metropolitan areas of the country. * * * Several factors appear to have been responsible for the proportions of the upsurge in the United States; namely, an increased influx of

drugs from Italy, where internal controls had temporarily broken down, followed by a deluge of heroin from Red China which used the drug as a means to obtain foreign exchange and as a weapon to demoralize the people of free countries."

3. "Perhaps the most important factor in reducing the incidence of addiction was the realization that, although narcotic abuses were generally on the increase, in those areas where the courts imposed severe prison penalties traffic and addiction were at a virtual minimum or nonexistent."

4. "Inquiry into the enforcement program revealed serious obstacles which have been placed in the path of enforcement officers as the result of recent court decisions. These decisions have tended, under certain circumstances, to furnish the criminal with a cloak of immunity to the detriment of society as a whole."

5. "In those areas of the country where we found leniency in sentencing the prevailing practice, drug addiction and narcotic traffic without exception are on the increase."

APPENDIX B

The annual report of the United States Attorney for the Southern District of New York to the Attorney General of the United States for the period commencing June 1, 1959, and terminating May 31, 1960, shows under the heading of "CRIMINAL DIVISION STATISTICS" the following:

"The statistics for this period reveal the following:

Cases pending June 1, 1959. . . . . . 619
Cases commenced during period. .1,046
Cases closed during period. . . . . .1,129
Cases pending May 31, 1960. . . . . . 536"

Of these cases, figures from the Clerk's Office disclose that the following were narcotics cases:

Cases pending June 1, 1959. . . . . . 111
Cases commenced during period. . 137
Cases closed during period. . . . . . 154
Cases pending May 31, 1960. . . . . . 94

