Charles Emanuel **WHITE** and John Lewis, Appellants,

v.

**UNITED STATES** of America, Appellee.

No. 20566.

United States Court of Appeals
Ninth Circuit.

April 9, 1968.

Rehearing Denied June 4, 1968.

William V. O'Neal (argued), San Diego, Cal., for appellant.

Shelby R. Gott (argued), Asst. U. S. Atty., Edwin L. Miller, Jr., U. S. Atty., San Diego, Cal., for appellee.

Before MERRILL and ELY, Circuit Judges, and STEPHENS, District Judge.

STEPHENS, District Judge:

John Lewis and Charles Emanuel White were charged in a five-count indictment and both convicted on count one of conspiracy to import narcotic drugs, 21 U.S.C. § 174. Lewis was convicted on count two (aiding and abetting the importation of heroin, 21 U.S.C. § 174, 18 U.S.C. § 2) and count three (aiding and abetting the importation of cocaine, 21 U.S.C. § 174, 18 U.S.C. § 2). Lewis was not named in counts four and five. White was not named in counts two and three. He was acquitted on count four by the court before the case was submitted to the jury and count five was dismissed.

Lewis was sentenced to twenty years' imprisonment on each count to run concurrently; a fine was also imposed on each count in the sum of $20,000 and the judgment expressly provided that the fines should be cumulative. Therefore, it is necessary to consider the appeal as it relates to each count.

The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. This court has jurisdiction pursuant to 28 U.S.C. §§ 1291 and 1294.

Although no point on appeal expressly claims that the evidence is insufficient to support the verdict, this is in fact the principal contention of appellants. This contention appears from the collection of annotations which comprises the bulk of Point One, entitled, "Defective Indictment," and Point Four, entitled, "Admission of Hearsay Evidence which Should Have Been Held to Be Inadmissible, of A Prejudicial Nature." We are persuaded by a review of the record that the evidence was sufficient to support the verdict. Consideration of this point first will supply the facts and facilitate discussion of the other points.

It should be borne in mind that in considering the sufficiency of the evidence to sustain a verdict of guilty, the evidence must be viewed in the light most favorable to the prosecution. In support of this principle, see Glasser v. United States, 315 U.S. 60 at 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); Moody v. United States, 376 F.2d 525 at 527 (9th Cir., 1967) and Mott v. United States, 387 F.2d 610 at 612 (9th Cir., 1967). The evidence of conspiracy is largely circumstantial but as pointed out in Diaz-Rosendo v. United States, 357 F.2d 124 at 129 (9th Cir., 1966), the nature of a conspiracy is such that it can rarely be proved any other way. The jury is entitled to reach its verdict not only upon the evi-

dence actually produced before it, but also upon such inferences as reasonable persons might draw from the evidence. Mathes and Devitt, Federal Jury Practice and Instructions, §§ 8.03, 8.04; Tot v. United States, 319 U.S. 463 at 467, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943); United States v. Romano, 382 U.S. 136 at 141, 86 S.Ct. 279, 15 L.Ed.2d 210 (1965).

■ Four persons were named in count one as parties to the conspiracy: Lewis, White, Swindell McNeal and Edna Nesmith. They were all residents of New York. They all left New York, flew to Los Angeles and proceeded to Tijuana by automobile. They traveled in pairs. Appellant Lewis and Swindell McNeal left New York on November 7, 1964 and stayed overnight in Detroit. The following day they flew to Los Angeles, rented one car in Los Angeles and another in San Diego and drove both cars to Tijuana. Appellant White and Nesmith left New York on November 8, 1964 and flew directly to Los Angeles, rented a car and drove to Tijuana. The two pairs arrived in Tijuana on the same day, at the same place, at approximately the same time. A short time later three of the parties were arrested when they attempted to enter the United States. Lewis was arrested in Detroit on January 18, 1965.

Prior to commencing this excursion, McNeal, who had worked for Lewis in New York, had a discussion with Lewis about a trip to Mexico. On another occasion, about a week before starting their trip, McNeal and Otis Johnson were in Lewis' New York apartment and McNeal overheard a conversation between Lewis and Otis Johnson. Otis Johnson was appellant White's brother-in-law. Lewis and Johnson were apparently arguing about money. At that time Johnson gave Lewis a sum of money and although McNeal was not sure of the exact amount, the sum of $4,500.00 was discussed.

On November 7, 1964, while in Detroit, McNeal overheard a telephone conversation between Lewis and an unknown person at which time Lewis remarked, "You know I have a 5:00 o'clock appointment, and every time there is a mess-up with somebody." In another telephone conversation on the same day, McNeal overheard Lewis say, "Why can't you get a flight," and "There's a flight at all times of night."

While Lewis and McNeal were preparing for their trip to Mexico, appellant White and Edna Nesmith were doing the same thing (with an assist from Lewis). White told Miss Nesmith on November 7, 1964 that she would receive a telegram from Detroit stating that her brother was ill. This was to make it easier for her to leave work and go with White to California. He told her that he had arranged the telegram with John Lewis. She did receive such a telegram from Detroit on the night of November 7, 1964. Lewis was in Detroit at that time. It is reasonable to infer that he sent it pursuant to prior arrangement with White.

The next morning, November 8, 1964, White and Miss Nesmith were driven to the airport in New York by White's brother-in-law, Otis Johnson. En route White and Johnson were discussing an appointment in Mexico. White wanted to catch the 10:00 o'clock plane so that he could get to California in time. However, they did not leave New York until about 12:00 o'clock and arrived in Los Angeles about 3:30 or 4:00 o'clock. White rented an automobile and he and Miss Nesmith drove directly to the Foreign Club parking lot in Tijuana, Mexico. They arrived after dark and were issued parking ticket number 2067.

When Lewis and McNeal arrived in Los Angeles on November 8, 1964, Lewis rented an automobile in Los Angeles. The Avis representative in Los Angeles remembered renting a car to Lewis on that date. The two men then drove to San Diego where McNeal rented another car. The Avis representative in San Diego remembered renting the car to McNeal. The two men drove both cars to the Foreign Club parking lot in Tijuana, arriving at the same time. McNeal was issued parking ticket number 2059.

It should be noted that the number of the parking ticket issued to White was only eight numbers from the ticket issued to McNeal. The parking lot attendant identified both Lewis and White and testified that he saw them in the Foreign Club parking lot on November 8, 1964 at approximately the same time. He further testified that parking tickets came in bunches of 25 and that they were issued by the attendant in numerical order. Since McNeal's parking ticket was number 2059 and White's was number 2067, it could reasonably be inferred that they were originally in the same bunch and being numerically so close together they tend to corroborate the attendant's testimony that Lewis, who arrived about the same time as McNeal, and White were in the parking lot at about the same time. The numerical sequence would also suggest that Lewis and McNeal arrived before White and Nesmith.

Lewis told McNeal to go into the Foreign Club and have a drink and that he, Lewis, would return shortly. McNeal did as instructed and Lewis drove his car out of the parking lot. After a while, Lewis returned to the Foreign Club bar and remarked to McNeal, "People never keep appointments." Lewis again left the Foreign Club and when he returned, found McNeal asleep in the car McNeal had rented. He instructed McNeal to follow him and the two men drove into the hills around Tijuana. McNeal observed Lewis place the narcotics into two blue flight bags and put the blue bags into the McNeal car. They then drove their respective automobiles to the border. McNeal was told to drive on ahead when they reached the border and that Lewis would catch up with him after they had crossed. McNeal was arrested as he entered the United States.

When White and Nesmith arrived at the Foreign Club, White went into the Club and later returned to the car. Possibly, this was while McNeal was in the bar having a drink. However, White and McNeal did not know each other. When White returned to his automobile, he and Nesmith drove around Tijuana for five

or ten minutes and then returned to the Foreign Club. White again entered the Club and came back to the car, remarking to Nesmith, "I missed him."

White and Nesmith then drove to the border. They were arrested as they entered the United States at San Ysidro about 7:40 P.M., about an hour before McNeal crossed the border and was arrested. In White's car the customs agents found a bottle of cough syrup containing codeine, a briefcase containing $6,400.00 and the Foreign Club parking ticket. Packages of heroin and cocaine were found on the person of Edna Nesmith. In McNeal's car, the agents found the two blue flight bags containing 23 ounces of heroin and about one-half ounce of cocaine. On the morning of November 9, 1964, White and Nesmith were examined by a doctor. White was certified as addicted to heroin and Nesmith admitted to using cocaine. The narcotics users had the money and the other couple had the narcotics.

From this evidence the jury was warranted in finding that there was a conspiracy between Lewis and White as charged in the indictment. These were four New Yorkers who had no apparent legitimate reason to travel across the continent for a brief presence in Mexico. Furthermore, the trip was accomplished in a deceptive or devious manner. The jury undoubtedly could have found these events too interlocked to constitute coincidence and that it was planned and intended that White should purchase narcotics from Lewis in Mexico and return with them to the United States. And further, the jury could have found from this evidence that after Lewis failed to meet White he found himself in possession of the narcotics which he had intended to sell to White and found himself against the necessity of arranging for them to be brought into the United States. It would be reasonable for the jury to conclude that McNeal had been brought along and supplied with his own independently rented car in case of just such a contingency, since Lewis was troubled in advance with the problem of

people not keeping appointments. The evidence is therefore sufficient to support the conviction for conspiracy and to establish that Lewis aided and abetted McNeal in importing the narcotics as alleged in counts two and three.

Appellants contend it was error to admit the testimony of McNeal and Nesmith in that their testimony was the testimony of accomplices which required corroboration and was the hearsay testimony of co-conspirators.

■ The testimony given by McNeal and Nesmith was amply corroborated, and it was not excludable as hearsay. Their testimony of statements they themselves made out of court was subject to cross-examination. 4 Wigmore §§ 1048–1059 (3d ed. 1940). Their testimony of statements made by Lewis and White (introduced only against the declarant) qualifies as admissions of a party. 4 Wigmore § 1048, et seq. (3d ed. 1940); Witkin, California Evidence, § 220 (1958); A.L.I. Model Code of Evidence, Rule 506. The statements made by Lewis were binding upon Lewis. Those made by White were binding upon White. But the statements made by either Lewis or White are not admissible as evidence against the other unless the trial judge is satisfied that there is enough other evidence to establish the alleged conspiracy, if the jury should believe the other evidence on the subject of conspiracy. Carbo v. United States, 314 F.2d 718 at 735 (9th Cir., 1963). The fact that the trial judge denied a motion for acquittal on this count indicates that he did find that there was sufficient other evidence, otherwise he would have been bound to grant the motion pursuant to Federal Rules of Criminal Procedure, Rule 29. We agree that there was sufficient other evidence, which if believed, would establish the existence of a conspiracy. It was not error to submit this issue to the jury.

■ When such issue is submitted to the jury, the jury may consider all of the evidence which has been admitted, including the declarations of one of the alleged co-conspirators implicating the other. This is not inadmissible hearsay because it comes within the well-recognized exception to the hearsay rule that one co-conspirator's statements are admissible against the other. 4 Wigmore § 1079 (3d ed. 1940); 1 Conrad, Modern Trial Evidence § 520, et seq. (1956); Witkin, California Evidence § 521 (1966). The instruction of the trial judge to the effect that the statements in question were binding only upon the declarant until such time as the jury found a conspiracy to exist was more favorable to the defendants than the law requires since in effect the jury was required to find beyond a reasonable doubt that a conspiracy existed before the statements could be considered. Having arrived at this conclusion the jury would have no occasion to consider the statements at all. Carbo v. United States, supra at 736.

■ Accepting, therefore, that a conspiracy existed as charged, it came to an end with the arrest of White, Nesmith and McNeal. After the conspiracy had come to an end and White and McNeal were in custody in San Diego, McNeal testified that White told him that Lewis was the man White was to have met in Mexico. He also testified that while he, McNeal, was free on his own recognizance, he communicated with Lewis and that Lewis had prepared a story implicating White which McNeal was to tell the police. The trial judge instructed the jury that each of these declarations was admissible only against the respective declarant to prove his participation in the conspiracy and that neither of these statements were binding upon any other defendant. Murray v. United States, 250 F.2d 489, 491 (9th Cir., 1958). We must assume that such instructions were followed. Delli Paoli v. United States, 352 U.S. 232, 242, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957). In light of the evidence of conspiracy, the admission of these statements, limited as they were by the court's instructions, could not have resulted in substantial prejudice to the defendants.

■ Appellants claim that Lewis had no knowledge that the blue flight bags contained narcotics and, therefore, could not be guilty of aiding and abetting McNeal in the importation of heroin and cocaine. Quite to the contrary, the record indicates that McNeal testified that Lewis had possession of the "stuff," transferred it to the blue flight bags and placed the blue bags in McNeal's car. McNeal then drove directly to the border where the bags were discovered and found to contain narcotics. The fact that Lewis took the precaution to make the transfer in the hills and to avoid being in the same car with the "stuff" when it crossed the border are circumstances which clearly point to Lewis' knowledge of the contents of the flight bags.

■ It is alleged that the indictment was defective because it failed to include in its averments an essential element of the crime, to wit, knowledge of appellant Lewis that the narcotics had been imported into the United States contrary to law. The pertinent language of the indictment in this case, to wit, "* * * defendants * * * White * * * and * * * Lewis * * * conspired * * * knowingly to import * * * narcotic drugs into the United States * * * in violation of 21 U.S.C. § 173," is clearly sufficient.[1] Palomino v. United States, 318 F.2d 613 (9th Cir., 1963), cert. denied, 375 U.S. 932, 84 S.Ct. 335, 11 L.Ed.2d 264 (1963). See also Tenorio v. United States, 390 F.2d 96 (9th Cir., 1968); Olar v. United States, 391 F.2d 773 (9th Cir., 1968).

■ Appellants' second and third points may be treated together as they both deal with evidence allegedly taken from Lewis' New York apartment. Point Two alleges an unlawful search and seizure and Point Three claims a violation of due process allegedly in the suppression of records and documents beneficial to Lewis' defense. These contentions are wholly without substance. There is nothing in the record from which one could conclude that there had been an unlawful search of the Lewis apartment. There is no indication that any evidence taken from the Lewis apartment was introduced. There is nothing in the record to indicate that any records or documents were taken from the Lewis apartment, no record of a demand for such records and no record of suppression.

■ Appellants argue that the prosecution made prejudicial statements during final argument. While there was one statement that could be characterized as overstepping the bounds of good advocacy, an immediate objection was made, the statement withdrawn and the jury instructed to disregard the remark. There is no requirement that counsel remain neutral during argument; he may properly comment on the evidence during argument and suggest how it is best to be viewed. Upon review of the prosecution's argument, there are no statements so prejudicial as to require reversal.

■ It is urged as a sixth ground that the jury instructions were prejudicial and erroneous. This assertion is without support. Initially, no party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matters to which he objects and the grounds for his objections. Fed.R.Crim.P. 30. An objection made after the verdict is returned comes too late. Only a timely objection will preserve the rights of the objecting party on appeal. A conference on instructions was held before the court charged the jury during which some ob-

---

1. Although count one concludes with the language, "* * * in violation of 21 U.S.C. § 173," and count one charges a violation of 21 U.S.C. § 174, there is no conflict. Count one charges appellants with a violation of 21 U.S.C. § 174, to wit, conspiracy to import drugs contrary to law. The words "contrary to law" refer to a violation of 21 U.S.C. § 173. Therefore, the use of the words "in violation of 21 U.S.C. § 173," in place of the words, "contrary to law," as contained in § 174, not only fails to present any conflict but is in fact more accurate.

jections were made. After instructing the jury, but before excusing them for deliberation, the court held a brief conference out of the presence of the jury in which appellants' counsel reiterated the objections made earlier. With certain exceptions, to which attention will be directed, the objections raised in appellants' brief are not those that were timely made and thereby preserved. Moreover, they do not pertain to errors of the type which might be characterized as "plain" and require our consideration, even in the absence of objection under the requirements of Rule 30.

■ The attorneys for Lewis and White at trial, and the attorney for both Lewis and White on appeal, all differed with the trial court with regard to the instructions on aiding and abetting. Only appellant Lewis was charged (see counts two and three) and convicted of this offense. The attorneys at trial objected to the judge's proposed instruction on aiding and abetting taken from 27 F.R.D. 39 §§ 2.06 and 2.07 at pp. 53 and 54. The charge given to the jury was as follows:

"Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal [and]

"Whoever willfully causes an act to be done, which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

"Every person who thus willfully participates in the commission of a crime may be found to be guilty of that offense. Participation is willful if done voluntarily and purposely and with specific intent to do some act the law forbids, or with specific intent to fail to do some act the law requires to be done; that is to say with evil motive or bad purpose either to disobey or to disregard the law.

"In order to aid and abet another to commit a crime it is necessary that a defendant willfully associate himself in some way with the criminal venture; and that he willfully participate in it as in something he wishes to bring about; and that he willfully seek by some action of his to make it succeed."

The substance of the objection was that the court should replace the word "willfully" with the word "knowingly." Such a distinction is of little weight. This is particularly true in that the court interchanged the terms throughout the instructions on aiding and abetting and conspiracy, and at times used both together, suggesting they are synonymous. At one point the judge remarked, "You will note that the word 'knowingly' has been used here, and that, of course, is to insure that no person would be convicted for an act done because of any mistake or inadvertence or other innocent reason."

■ Appellants complain that the court failed to instruct the jury on constructive possession and that the court did not go beyond the general language of 21 U.S.C. § 174 making unexplained possession of narcotic drugs sufficient to sustain a conviction [citing United States v. Hernandez, 290 F.2d 86 (2nd Cir., 1961)]. In *Hernandez*, the court noted that it appeared from an agent's testimony that the defendant did not have physical possession of the narcotics but the defendant had merely introduced the agent to a supplier. Thus, as the court correctly noted, the question of constructive possession (the ability to dominate or control as opposed to actual physical custody) "became all important." 290 F. 2d at 90. This case presents no question of constructive possession. McNeal's testimony shows that McNeal knew that he had narcotics in his car when he crossed the border, so he had actual physical possession of the narcotics. Lewis is charged with aiding and abetting the importation, not with constructive possession. Lewis supplied the narcotics, instructed McNeal to cross the border and it may be inferred that he followed him across as planned and knew that the nar-

cotics had been imported. The instructions on aiding and abetting were adequate in all respects.

Many of the instructions asserted by appellants as instructions that should have been given are totally inapplicable to the case as presented. The court properly and fully instructed on all points raised in appellants' brief and any difference in choice of words to express a given proposition did not amount to error.

 As a final ground for appeal appellants maintain that evidence was admitted in violation of the rules announced in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) and Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1963). Miranda v. State of Arizona clearly has no application to this case.□Miranda applies only to cases where the trial began after June 13, 1966. Johnson v. State of New Jersey, 384 U.S. 719 at 733–734, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). A verdict was reached in this case on May 7, 1965.

In Massiah v. United States, the defendant had retained counsel, pleaded not guilty and was free on bail. A government agent was permitted to place a radio transmitter in a car belonging to one of defendant's confederates. In this way federal officers were able to overhear a conversation during which the defendant made incriminating statements. It was held that the defendant had been denied his right to counsel under the Sixth Amendment. Unlike Massiah the statements by Lewis to McNeal, after McNeal had been released from custody, were made before Lewis was even arrested. McNeal denied that he was working for the government after his release and there was no evidence that McNeal was prompted to elicit information from Lewis during this period. Lewis was not arrested until January 18, 1965.

Escobedo v. State of Illinois is distinguishable. In that case the investigation had closed and the petitioner had become the accused—the process had shifted from investigatory to accusatory, his right to counsel attached at this point and his request to speak with his attorney was denied. Appellant Lewis maintains the shift from investigatory to accusatory took place when McNeal was still incarcerated in San Diego and that it was at that time that Lewis' right to counsel attached. (Appellants' Brief at p. 48). The Miranda decision pointed out that an investigation focused on an accused, "When the individual is first subjected to police interrogation while in custody at the station or otherwise deprived of his freedom in any significant way." Miranda, supra at 444, 447, 86 S.Ct. 1602, 1629, 16 L.Ed.2d 694. All the statements Lewis made to McNeal were made before Lewis was taken into custody or deprived of his freedom of action in any significant way. This distinction eliminates any application of Escobedo to the present case.

Judgment affirmed.