**UNITED STATES of America,
Appellee,**

v.

**Carmine GUANTI, Arnold Romano, Dominick Romano and Frank Sherbicki,
Appellants.**

**Nos. 185–188; Dockets 33632–33634,
33685.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 10, 1969.

Decided Jan. 29, 1970.

**794**

Arnold E. Wallach, New York City (Joseph Panzer, New York City, of counsel), for appellant Guanti.

Monroe H. Freedman, and Ralph J. Temple, Washington, D. C. (Freedman & Temple, Washington, D. C., of counsel), for appellant Arnold Romano.

David B. Isbell, Washington, D. C. (E. Edward Bruce, Covington & Burling, Washington, D. C., and James M. La-Rossa, New York City, of counsel), for appellant Dominick Romano.

H. Howard Friedman, New York City, for appellant Sherbicki.

Michael W. Leisure, Asst. U. S. Atty., New York City (Robert M. Morgenthau, U. S. Atty., for the Southern District of New York, New York City, Maurice M. McDermott and Charles B. Updike, Asst. U. S. Attys., New York City, of counsel), for appellee.

Before WATERMAN, MOORE and KAUFMAN, Circuit Judges.

MOORE, Circuit Judge:

The defendants Carmine Guanti, Arnold Romano, Dominick Romano and Frank Sherbicki appeal from judgments of conviction following a two-week trial before court and jury. The indictment filed in 1964, charged in a single count twelve defendants and sixteen named co-conspirators with conspiracy to violate the Federal Narcotics Laws, 21 U.S.C. §§ 173, 174. The appellants here and two co-defendants were fugitives when the first trial of the indictment took place in 1965. At that first trial four defendants were found guilty and two were acquitted. The judgments were affirmed. United States v. Armone, 363 F.2d 385 (2d Cir.), cert. denied, Viscardi v. United States, 385 U.S. 957, 87 S.Ct. 391, 17 L.Ed.2d 303 (1966). The four defendants now appealing were apprehended after the conclusion of the first trial. Their trial was in March, 1969.

By way of brief introduction, the government claims that the appellants, together with the co-defendants and co-conspirators, were engaged in a conspiracy from 1956 through 1960 to import huge amounts of heroin into the United States from France and to distribute the drugs after their illicit importation; that the conspiracy had three pairs of exporter-courier links which delivered the heroin to an importer link in New York; that three of the defendants here were involved in the import link— the Romanos and Sherbicki; and that the defendant Guanti was the receiver link and was more closely tied to the wholesaler link as a messenger for them.

The activities of the import link are most important here since the claim is made that there were two conspiracies and that the Romanos, as members of the so-called Cahill group, either abandoned, or were excluded from, the continuing conspiracy before the statute of limitations cut-off date of September 30, 1959. The government characterizes the importers as a group having a proprietary interest and several assistants. At the core were Joseph Armone, Stephen

Grammauta and the defendant Arnold Romano. Dominick Romano and Frank Sherbicki, both defendants here, are said to have been assistants. Three other members of this group would take delivery of the heroin when it entered this country. Initially, the couriers delivered it to Joseph Cahill. Then as the conspiracy progressed, Cahill transferred this function to Charles Hedges and Nicholas Calamaris. Hedges was the chief government witness both at this trial and in the 1965 trial.

The evidence reveals how each of the pairs of export-courier links made initial contact with Cahill and how Hedges was later worked into the deliveries to the import group after his release from prison in the Spring of 1958. As Hedges became more trusted, he was introduced to more of the principals in the conspiracy and became more familiar with their dealings. He went with Cahill to take delivery of the heroin from the couriers; he met the wholesalers and made deliveries to them; he carried money back and forth between various principals; he recounted events which linked each of the defendants here with the conspiracy.

The details of each event and how various deliveries and payments were made during the five-year period involved need not be given *in extenso*. The relevant facts relating to the claims of error will be considered in the discussion of these claims.

All appellants adopt the arguments of their co-appellants insofar as they may aid their own positions. Since each appellant claims specific reversible errors as to him, they are best dealt with separately.

## ARNOLD ROMANO

*Deprivation of Counsel*

Arnold Romano (Arnold) for his first point asserts (in his brief) that he was denied his right to counsel because he was "forced to trial in the unexpected absence of his retained counsel" and because he had "an attorney whom he did not desire and who was not prepared to defend him." The many decisions in this Circuit cited by this appellant and by the government are of little assistance in resolving this issue. If any principle is to be gleaned therefrom, it is that every case must be judged upon its own set of facts. Somewhat analogous fact situations are to be found in cases in which similar contentions have been accepted and in others rejected. The proposition that the Sixth Amendment guarantees the right to counsel of one's own choosing is merely the preamble to the many exceptions which the courts have superimposed upon this fundamental privilege. Therefore since the facts seemingly control, we must turn to them.

On October 8, 1964 upon arraignment Arnold appeared by counsel, presumably of his choice, David M. Markowitz, who continued in such capacity at least through 1967.

On April 27, 1965, the date on which the trial was to commence, Mr. Markowitz appeared for Arnold; Arnold did not, preferring to flee and jump his $50,000 bail.

In July 1966 Arnold was reapprehended and thereafter was tried and convicted of bail-jumping. Even then Mr. Markowitz, still his counsel, represented to the Court that "we are prepared to go to trial in the narcotics conspiracy case at any time."

As late as December 27, 1967 Arnold by affidavit averred that his defense was prepared and that he was ready for the narcotics trial.

On October 8, 1968 a New Jersey attorney, Michael A. Querques, filed a notice of appearance for Arnold but Mr. Markowitz was designated therein as local counsel.

On November 20, 1968 Mr. Querques moved on behalf of Arnold to dismiss the indictment, Mr. Markowitz by affidavit still asserting Arnold's readiness to proceed to trial.

As early as October 1968 Mr. Querques (and undoubtedly his client) knew that the narcotics trial would be set for

March 1969 in the Southern District of New York and on February 7, 1969 knew that March 3, 1969 was fixed for its commencement. And on February 27, 1969 Mr. Querques stated that he would be present.

The next day, Friday, February 28, 1969, however, in the late afternoon Mr. Querques notified Government counsel of a conflicting New Jersey trial engagement for the following Monday, March 3rd, which would require his services for at least a month. Despite telephonic communication between the New Jersey and New York judges, the New Jersey judge refused to yield and ordered Mr. Querques to remain in court in New Jersey, thus creating an irresistible force against an immovable body situation.

Having made all preparations months in advance for a multi-defendant narcotics conspiracy trial, the New York trial judge could scarcely allow the other defendants and their counsel to remain in idleness on the sidelines for a month or more if any reasonable solution protective of Arnold were available. He chose to find the solution in Mr. Markowitz, who had been prepared in April 1965 and whose preparedness had been reasserted at least through November 1968.

Without impugning Mr. Querques' position or belittling the dilemma in which he found himself, this court must try to put itself in the trial court's shoes. The reasons given by Arnold and Mr. Markowitz were scarcely reassuring. The trial court had to take some immediate action. There were several possibilities. It could allow Arnold to represent himself as Arnold requested. Such a course might well have been made the basis for appellate argument of trial without counsel. The court could have assigned Mr. Markowitz for all purposes but, had it done so, this Circuit's decisions of the constitutional right of *pro se* representation might have caused future difficulties. Rather than founder on the shores of a Scylla or Charybdis, the Court chose a middle course, thus giving Arnold as much of himself and as much of Mr. Markowitz as he might wish to take. It directed Mr. Markowitz to sit with, and be available to, Arnold throughout the trial so that Arnold was enabled to proceed *pro se* with the added advantage and protection of counsel—for four years at least of his own choice.

The *in terrorem* argument of the 7,000 pages of the April 1965 trial record which Mr. Markowitz claims he would not have had time to read is not impressive. Experienced trial counsel could have culled the essential portions of that record within the allotted time.

■ The trial record before us convincingly discloses that Arnold, short of disrupting the trial to wait for Mr. Querques, was given every opportunity to examine and cross-examine *pro se* or by counsel and to participate in argument or to remain mute. Any action that the trial court could have taken (except delay) would have been subject to the claim of error. Moreover, Arnold's failure to take full advantage of Mr. Markowitz' talents was of his own choosing. We find that he was not deprived of any constitutional right to counsel on the record presented to us and that the trial court was entitled to rely on our opinion in United States v. Bentvena, 319 F.2d 916, 936 (2d Cir.), cert. denied sub nom., Ormento v. United States, 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963) in which it was said that "if a defendant does not give the court adequate notice that his retained counsel will be unable to attend the trial, the trial court may, in the exercise of its sound discretion, do what is reasonably necessary to meet the situation."

### The Alleged Dual Conspiracies

Arnold as a second point asserts that there were multiple conspiracies and that the trial court's charge was at variance with United States v. Borelli, 336 F.2d 376 (2d Cir. 1964), cert. denied sub nom., Cinquegrano v. United States, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965); and United States v. Kelly, 349 F.2d 720

(2d Cir. 1965), cert. denied, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966). This argument, however, is premised on the assumption that there were two separate conspiracies in fact. To create the separate conspiracies theory, appellants artificially divide the conspiracy into a "Cahill group" and a "Calamaris group."

In an endeavor to simplify the facts relating to this claim and in the interest of clarity despite some repetition, a heroin export group existed in France consisting of Barnier (Paris), the Aranci brothers (Marseilles) and another (not named). They used as couriers to bring the heroin into this country Bourbonnais (an airline purser), Aspelund (a merchant seaman), Roulet (an airline employee), Henripierre (who accompanied Roulet), Rosal (Guatemalan Ambassador to Benelux countries), and Tarditti. The couriers delivered the heroin to an import group consisting at various times of Cahill, Arnold Romano, Dominick Romano, Hedges, Armone, Calamaris, Grammauta, and Sherbicki. To put the heroin into the hands of a wholesale group, that group used the defendant Guanti as a conduit. The Government alleged that this conspiracy continued from 1956 through 1960. The money for the heroin was paid by the wholesalers to various members of the import group. In Aspelund's case, Cahill paid him and he in turn paid Aranci less a delivery commission. Bourbonnais was likewise paid by Cahill. Subsequently, Hedges became associated with Cahill and would receive payments which he would turn over, according to his testimony, to Cahill, Grammauta, Armone, Calamaris, Arnold Romano, or Sherbicki.

Because of the alleged cut-off date (statute of limitations) of September 30, 1959, events thereafter assume importance. In December 1959 Bourbonnais, Calamaris and Tarditti (an intermediary) met with Rosal in New York. Tarditti and Rosal removed three suitcases from the taxi in which Rosal arrived and placed them in Calamaris' car. Additional suitcases were delivered by Tarditti and Rosal to Bourbonnais in April 1960 and July or August 1960. The contents were turned over to Calamaris on Barnier's directions. Also in 1960 Pacelli (a wholesaler), Hedges and Armone negotiated, and Calamaris effected, the delivery of three kilos to Hedges. Hedges, dissatisfied with his commissions, discussed an increase with Arnold who agreed with him. In 1960 Cahill gave Hedges $10,000 in cash to deliver to Arnold in Miami which Arnold received at the airport.

■ The denouement came in October 1960 when Bourbonnais, Calamaris, Rosal and Tarditti were arrested. 52 kilos of heroin and $26,000 in cash were found in the taxi trunk and $42,000 in cash in the Calamaris car, in various packages. From Bourbonnais was obtained a notebook revealing the packages delivered to Calamaris and the money received. These events were sufficient to warrant the factual conclusion that the conspiracy had not terminated by the prescriptive cut-off date of September 30, 1959, and that Arnold had not withdrawn therefrom with finality prior to that date.

*Claimed Withdrawal From the Conspiracy*

■ As to withdrawal and the refusal to recall Hedges, Hedges testified that he had a conversation with Arnold in which Arnold said: "When my brother Dom and I had this, there was no trouble. We made a living out of it and now it is too involved." The date of this conversation and whether it meant that the Romanos were out of the business or getting out were questions for the jury. It seems likely that the date was in 1960. The defendants presented co-conspirator James Godwin, who testified that late in 1959 he overheard a conversation between Hedges and Arnold in which Arnold exhorted Hedges to get out of the business, saying that he himself had been out for a "long time." Based on this testimony, there was a request to recall Hedges. This request was denied. Defendants' counsel had failed to cross-examine Hedges on the question of with-

drawal. The government made efforts to locate Hedges which were fruitless. Hedges had gone into hiding; he had already been shot. The court took "judicial notice of the state of Hedges on the stand who was observed as terrified." The defendants surely knew the importance of their withdrawal defense and that the conversation with Hedges was relevant thereto. They should have cross-examined more thoroughly if they so desired. The Romanos were not denied the opportunity to present evidence and argument on their claimed defense of withdrawal. But from the evidence adduced, the jury could properly conclude that they had not withdrawn from the conspiracy on or before the date of the statutory bar.

### Speedy Trial

■ Arnold asserts that the record reveals a denial of his Sixth Amendment right to a speedy trial. The facts reveal that Arnold was first arrested in July 1964. When the first trial on the narcotics indictment was held in May 1965, Arnold failed to appear and forfeited his $50,000 bail. He was reapprehended in July 1966 and was tried, convicted and sentenced to five years' imprisonment for bail jumping. Several times during the pendency of the bail jumping action, Arnold's counsel sought an adjournment by urging that the narcotics indictment should be tried first. These requests for an adjournment cannot be treated as demands for a trial of the narcotics indictment.

■ From the time of his sentencing in October 1966 for bail jumping until March 1968, Arnold made no effort to have the narcotics indictment brought to trial. In March 1968 he moved to dismiss for lack of prosecution. This motion was denied on May 17, 1968 for failure to make the demand required to preserve the right to a speedy trial as required by United States v. Lustman, 258 F.2d 475 (2d Cir.), cert. denied, 358 U.S. 880, 79 S.Ct. 118, 3 L.Ed.2d 109 (1958) and United States v. Maxwell, 383 F.2d 437 (2d Cir. 1967), cert. denied,

Aiken v. United States, 389 U.S. 1043, 88 S.Ct. 786, 19 L.Ed.2d 835 (1968). Arnold was then produced for trial in August 1968. A renewal of his motion to dismiss was denied on November 26, 1968 since the recent delay could be attributed to Arnold's efforts to procure counsel. The following day the case was assigned for a March 1969 trial. We find no error in the denial of these motions. The record reveals no denial of the Sixth Amendment right to a speedy trial.

### DOMINICK ROMANO

Conceding (in his brief) that "There was evidence of an active conspiracy involving both an exporter at one end and the wholesalers at the other, occurring well after September 30, 1959, the cut-off date of the statute of limitations, Dominick Romano (Dominick), who claims to have been on the periphery of any conspiracy at best, argues that his association was only with the Cahill group which he asserts was replaced by the Calamaris group prior to September 30, 1959 and, hence, that the statute of limitations protects him. On appeal, Dominick contends that only two items of direct evidence and two of hearsay, all prior to September 30, 1959, connect him in any way with Hedges and Arnold in the conspiracy. In general, Dominick follows the factual analysis which Arnold makes in an attempt to prove that he was only in the Cahill group. Thus, Dominick states that the evidence "showed that one import group, to which the slight proof as to Dominick Romano tended to connect him, was cut off and replaced by another import group more than the prescriptive five years before the indictment."

■■ Dominick thus primarily places his defense upon the theory that prior to September 30, 1959 he had withdrawn from the conspiracy. Such a determination, however, was for the jury. Tacitly recognizing this conclusion, Dominick attacks the jury charge in that it "failed to require an individual determination with respect to the scope of any conspiratorial agreement shown as to Dominick Ro-

mano" and that it "failed to require the jury to find the necessary connection between Dominick Romano and the two overt acts charged which were not barred by the statute of limitations." Dominick's argument is based on the fallacious assumption that his "Cahill group" conspiracy ended with Cahill's replacement by Calamaris; that Dominick was associated solely with Cahill; and that, *ergo,* Dominick's participation automatically ceased. Dominick misconceives the nature of a continuing conspiracy, which may be likened to a theatrical performance in which many actors enter upon the stage to play their assigned roles and, having fulfilled their parts, they withdraw. Their individual withdrawals, however, do not terminate the performance or change their status as members of the cast.

The much-relied-upon *Borelli* and *Kelly* cases do not aid Dominick's cause. The mere substitution or use of a Hedges and a Calamaris as a link in the importation of heroin did not create separate or multiple conspiracies.

As to sufficiency of evidence, Dominick did go to a hotel, the Fifth Avenue, where in a room taken by Cahill under a different name, he received a package of heroin from Hedges and later to the Commodore where he discussed with Hedges the risks of hotel room operations and the possibility of his taking over Hedges' job. He was also connected with the conspiracy through his brother's (Arnold) statement that "When Dom and I had the business it was all right, but now it is getting too complicated."

██ Dominick also argues that he was "fatally prejudiced" by what he now refers to as a "Denial of Adequate Representation by Counsel" to his brother Arnold. Dominick was represented by his own counsel who had every opportunity to examine and cross-examine the witnesses. Every appellate counsel can speculate on appeal as to what might have happened had other or different trial tactics been pursued. However, speculation cannot replace actuality. If

counsel for the other co-defendants failed to take full advantage (in retrospect) of their then opportunities, they cannot successfully claim this failure as a ground for appellate reversal.

## CARMINE GUANTI

██ Guanti bases his appeal upon the theory that his Fifth Amendment rights against self-incrimination were violated by the trial court's charge and upon a multiple conspiracies argument. He concedes that the proof established that he received packages of heroin from Hedges but claims that there was no proof that he knew that the heroin was imported. Hoping that heroin will be treated by the Supreme Court in the same way in which it considered marijuana in Leary v. United States, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), Guanti pointed to the grant of certiorari by the Supreme Court, 395 U.S. 933, 89 S.Ct. 2001, 23 L.Ed.2d 448 (1969) in United States v. Turner, 404 F.2d 782 (3d Cir. 1968). However, this issue has now been resolved as to heroin by the Supreme Court's decision on January 20, 1970, wherein that Court said:

"'Common sense,' Leary v. United States, [395 U.S. 6, 46, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969)] tells us that those who traffic in heroin will inevitably become aware that the produce they deal in is smuggled, unless they practice a studied ignorance to which they are not entitled. We therefore have little doubt that the inference of knowledge from the fact of possessing smuggled heroin is a sound one; hence the court's instructions on the inference did not violate the right of Turner to be convicted only on a finding of guilt beyond a reasonable doubt and did not place impermissible pressure upon him to testify in his own defense." Turner v. United States, 396 U.S. 398, 417, 418, 90 S.Ct. 642, 653, 24 L.Ed.2d 610 (U.S. Jan. 20, 1970) (footnotes omitted).

See also our recent decision to this effect in United States v. Cuadrado, 413 F.2d 633 (2d Cir. 1969).

In addition Guanti contends that at most he was guilty only of substantive offenses, that he merely received the heroin, that there is no proof of any agreement with others to import and that being solely involved with Hedges, he should not have been contaminated by the proof relating to others.

The proof is more than sufficient to establish Guanti as the receiving link, quite apart from the gratuitous (as to Guanti) concession in the chart in Arnold Romano's brief that Guanti played this role. His multiple conspiracy and the *Borelli* charge arguments have been discussed with respect to his co-defendants.

### FRANK SHERBICKI

Sherbicki asserts as "prime points" of his appeal an alleged deprivation of a speedy trial and a failure of the trial judge to disqualify himself.

Sherbicki has not always sought a speedy trial. His trial could have been held in May 1965 with his then co-defendants but he preferred to avoid trial by becoming a fugitive. He was not rearrested until August 1965. His first motion thereafter for dismissal (November 1965) as well as his second (March 1966) were properly denied because there had been no unreasonable delay in assigning the case for trial. During the next two years, Sherbicki was serving part of a five- to ten-year New York State sentence and did not make any motion for a speedy trial. The third motion was denied (December 12, 1968) because the case had been assigned for trial in March 1969.

A fourth motion was made at the opening of the trial on March 3, 1969. When counsel for Sherbicki advised the trial judge that he intended to call him (the trial judge) as a witness, he quite properly referred the motion to another judge who denied a hearing and characterized the "speedy trial" claim as requiring "thick-skinned audacity" to press.

Sherbicki also advances the argument that the government failed to prove either overt act 10 or 11 as charged in the indictment. However, the Hedges-Armone conversation regarding the $50 per kilo increase for delivery services and the package-behind-the-radiator delivery in July 1960 by Sherbicki were matters for jury determination.

### THE CHARGE

Appellants Arnold and Dominick Romano strongly contend that there was error in giving the same "all-or-nothing" charge condemned in United States v. Borelli, *supra*, and United States v. Kelly, *supra*. The trial court charged the jury that all of the defendants must be acquitted if more than one conspiracy had been proved or if a single conspiracy did not continue beyond September 30, 1959. He directed the jury's attention to the fact that the government contended that there was a single conspiracy proved and that the defendants contended that there were two —one with a Chahill group as importers and one with a Calamaris group as importers. The trial judge was careful, when marshaling the evidence, to say that the jury could convict some, all, or none of the defendants as members of the conspiracy—hardly an "all or nothing" charge. Defendants also say that the court should have charged on subsidiary conspiracies—but unlike *Borelli*, which involved a multi-linked conspiracy of importers, exporters, and wholesalers widely separated in time and location, here there was basically a core conspiracy of importers, with the addition of Guanti, their connection to the wholesalers. The jury was also charged that it must determine separately as to each defendant whether he knowingly and wilfully became a member of the conspiracy charged. It is unwise to create the label, a *Borelli*-type or a *Kelly*-type charge, as a guide or standard for general future use in conspiracy cases. Each of the cases had to be re-

viewed and analyzed upon the specific fact situations there presented.

The government seeks to distinguish *Borelli* and *Kelly* by saying that there is here no problem of a defendant having only a limited knowledge of the scope of the conspiracy charged. A *Borelli*-type charge is said to be for protection in cases where the jury must focus on the scope of the agreement and on problems of limited participation and knowledge. The only issues here, the government argues, are (a) whether the conspiracy continued beyond the limitation period and (b) whether the Romanos withdrew from the conspiracy prior to the time the statute of limitations barred their prosecution.

The evidence was not ambiguous as to the scope of the conspiracy. It was obviously to import and distribute heroin. *Borelli* emphasizes the ambiguity of the evidence as to the scope of the agreement made by a particular defendant. 336 F.2d at 386 n. 4. *Kelly* requires that the jury clearly recognize the difference between the evidence against each defendant. 349 F.2d at 757. The jury was properly instructed to consider the proof against each defendant individually. The issue is really whether the conspiracy continued beyond September 30, 1959 and whether there was a withdrawal by the Romanos before that date. Both of these issues have been resolved above.

There is also assigned as error a supplementary charge given to the jury after it had been out for 24 hours. The jury returned a verdict of guilty as to all defendants 5 to 20 minutes after the supplementary instruction. The jury requested the summation of Dominick's counsel. Since this was not evidence, the request was denied. The trial judge then gave a restatement of the elements of conspiracy with a statement of the law relating to withdrawal. He did not give a specific charge as to Dominick since he feared that that would suggest that withdrawal was the only issue as to him or that only his guilt was questionable. This was not objected to

as an erroneous statement of law but as unresponsive to the request. There was no error in giving this instruction.

Judgment affirmed.