UNITED STATES of America,
Appellee,

v.

Anthony CALABRO et al., Appellants.

Nos. 1071, 1080 and 1081,
Dockets 71-1390, 71-1412 and 71-1430.

United States Court of Appeals,
Second Circuit.

Argued Aug. 12, 1971.

Decided Sept. 21, 1971.

Arnold E. Wallach, New York City, for appellant Calabro.

Ivan S. Fisher, New York City (Albert J. Krieger, New York City, on the brief), for appellant Puga.

Neal J. Hurwitz, New York City, for appellant Villanueva.

Walter J. Higgins, Jr., Asst. U. S. Atty., New York City (Whitney North Seymour, Jr., U. S. Atty., Peter F. Rient and Jay S. Horowitz, Asst. U. S. Attys., New York City, on the brief), for appellee.

Before FEINBERG, MULLIGAN and TIMBERS, Circuit Judges.

TIMBERS, Circuit Judge:

Appellants Calabro, Puga and Villanueva appeal from judgments of conviction entered upon a jury verdict after a four day trial in the Southern District of New York, Constance Baker Motley, *District Judge,* finding Calabro and Villanueva guilty on one count of concealing, transporting and selling heroin, in violation of the federal narcotics laws, 21 U.S.C. §§ 173 and 174 (1964),[1] and find-

1. These sections were repealed, effective May 1, 1971, by § 1101(a) (2) of the Drug Control Act of 1970, Pub.L. 91–513, 84 Stat. 1292, and were superseded by

ing all three appellants guilty on one count of conspiring to violate the same statutes. Calabro and Villanueva were sentenced to 12 year and 7 year concurrent terms, respectively.[2] Puga was sentenced to a 5 year term on the conspiracy count. Finding no error, we affirm.

## I.

An extensive undercover investigation by the Federal Bureau of Narcotics culminated in a two-count indictment returned November 20, 1970. Upon the uncontroverted testimony of the agents involved, the jury could have found as follows.

On July 17, 1970, Agent Scrocca, acting in an undercover capacity, met in Miami, Florida with Ada Villanueva for the purpose of infiltrating a narcotics ring. During their discussion of the narcotics trade, Villanueva asked Scrocca if he knew some of the people she had done business with in New York, including "Blackie from La Barraca." When Scrocca inquired which "Blackie" Villanueva meant, she further identified him as Blackie Calabro from Mulberry Street, her boyfriend and business associate.

On the evening of August 3, Agent Scrocca and fellow agents Boccia and Ellin, all acting in an undercover capacity, entered the La Barraca Restaurant located on West 51st Street near Eighth Avenue in Manhattan. Appellant Calabro was standing at the bar. Appellants Puga and Villanueva were seated together at a table in the dining area. The three agents joined the latter pair. Scrocca introduced Boccia and Ellin to them as receivers of narcotics who would handle Scrocca's transactions in New York. At one point in the conversation, Boccia went to the bar where he heard Calabro ask an unidentified male who the people with Villanueva were.

On the evening of August 4, Scrocca and Boccia again met Puga and Villanueva at the La Barraca. After a brief conversation, Villanueva explained that as Puga was going to Miami she had to drive him to the airport, but she would return later to discuss business. Villanueva, however, did not return to the La Barraca that evening.

Two nights later, on August 6, Scrocca and Boccia again went to the La Barraca. They saw Villanueva enter the restaurant and leave soon thereafter. They also saw Calabro standing at the bar. On three separate occasions during the evening, Calabro walked from the bar and stood within five feet of their table, staring at them. Later in the evening, Boccia was followed to the men's room in the rear of the restaurant by Calabro and an unidentified male. While Boccia was standing at the urinal, Calabro and his companion passed behind him; while doing so, one of them frisked the area of Boccia's waist and grasped his sidearm.

On August 11, the agents' undercover work resulted in Villanueva's offer to purchase heroin. That afternoon Boccia met Villanueva in a restaurant less than a block from the La Barraca. She offered Boccia three kilograms of heroin at $18,000 per kilogram. Boccia agreed to buy one kilogram as a sample. He asked if Villanueva had the heroin with her. Villanueva said her "Italian boyfriend from Mulberry Street" would deliver it to her. She instructed Boccia to meet her at the La Barraca that evening at 8:00 P.M. for delivery of the heroin.

At approximately 7:45 P.M. that evening, Calabro and Villanueva engaged in a conversation on a street corner next to

§§ 401 and 404 of that Act. The Act also provides that prosecutions for any violation of law occurring prior to the effective date of repeal will not be affected by reason thereof. Pub.L. 91–513, 84 Stat. 1292, § 1103.

2. Calabro's sentence in the instant case was ordered also to run concurrently with a 12 year sentence imposed on him by Judge Motley upon his conviction after jury trial of another substantive violation of the federal narcotics laws, his appeal from which was affirmed from the bench by us on August 12, 1971 (Docket No. 71–1389).

the La Barraca. Shortly thereafter they entered the La Barraca together. Within a few minutes Boccia arrived in a car and met with Villanueva on the sidewalk. Calabro watched them through a window of the La Barraca. Villanueva told Boccia everything was ready. Boccia drove off to obtain the money. Upon his return, Villanueva entered Boccia's car and directed him to drive one block to her mother's apartment. At that location, in return for $18,000 in cash, Villanueva gave Boccia approximately one kilogram of heroin.

The next evening, August 12, Boccia returned to the La Barraca where he saw Villanueva and Calabro seated together at the bar. After Villanueva joined the agent at a table, Boccia stated that he was pleased with the quality of the heroin and would want to purchase more in the near future. Villanueva said that Puga was bringing a load of cocaine from Miami which would be available shortly. Villanueva also told Boccia that she regularly received shipments of ten to twelve kilograms of heroin from Turkey. Boccia expressed an interest in the Turkish product rather than the lower quality French product. Villanueva explained that the heroin sold the night before in fact was from Germany and had been smuggled into the United States via France and Spain.

On August 19, Boccia returned to the La Barraca. Calabro and Villanueva were seated together at one end of the bar. Puga was seated at the other end. Villanueva approached Boccia and inquired if he was interested in doing more business. Boccia responded in the negative. Villanueva rejoined Calabro. Boccia then engaged Puga in conversation. Puga inquired if Boccia were satisfied with the product Villanueva had sold to him, and stated that he and Villanueva had more heroin available. Before Boccia left the La Barraca, Puga told Boccia to see him and Villanueva when he was ready to transact more business.

Boccia next met Puga and Villanueva on the afternoon of September 15 at a restaurant near the La Barraca. Boccia told them he needed three kilograms of heroin by noon the next day. Puga replied that heroin was scarce and that Boccia's order would be difficult to fill. Villanueva stated that they had two sources, one an Italian and the other a Latin, whom she could try. Boccia agreed to call Villanueva at midnight at the La Barraca.

At about 9:30 P.M. that evening, Calabro entered the La Barraca, followed half an hour later by Puga and Villanueva. Calabro left the La Barraca at about 10:30 P.M. At midnight Boccia telephoned the La Barraca. Villanueva, who was seated at a table with Puga, answered the phone and told Boccia that she had "one fine French watch," meaning one kilogram of heroin, which could be had for $18,000. A meeting was arranged for the following evening at the restaurant near the La Barraca.

On the evening of September 16, Calabro and Villanueva were seen walking together toward the La Barraca. Shortly thereafter Villanueva entered the restaurant near the La Barraca where she met Boccia. After telling Boccia that the merchandise would not be available until 11:00 P.M., she departed in the direction of the La Barraca. Ten minutes later she returned to Boccia and told him that the transfer could be made at 8:30 P.M. if he were available. Boccia agreed to pick her up in front of her apartment at 8:30.

When Boccia arrived at Villanueva's apartment that evening, Puga and Villanueva entered Boccia's car. Villanueva told Boccia that everything was ready, but that she would have to pick up the merchandise. She directed Boccia to drop her at the La Barraca and to drive with Puga to 103rd Street and West End Avenue. Boccia followed her instructions. While waiting for Villanueva at 103rd Street, Boccia expressed the hope that the merchandise would be as good as the last time. Puga assured him that it would be.

Villanueva arrived at 103rd Street at about 9:30 P.M. She told Boccia that her source wanted the cash in advance

of delivery. Boccia expressed displeasure and preference for the source of the prior sale. Villanueva said that Calabro, the source of the prior sale, always gave her the heroin on consignment, but that the new source would not. She also told Boccia that she had asked Calabro for heroin but that he had none available. When they could not agree on terms, Boccia left Puga and Villanueva, saying he would wait until Calabro had more merchandise.

## II.

Calabro's appeal raises the difficult question of the sufficiency of non-hearsay evidence to warrant admission of co-conspirators' hearsay declarations.

■ The trial court ruled that there was sufficient evidence, independent of Villanueva's hearsay utterances, to infer that Calabro participated in the alleged conspiracy,[3] and instructed the jury that Villanueva's statements could be considered as evidence against Calabro. He challenges the trial court's ruling on the sufficiency of the independent, non-hearsay evidence. We hold that the trial court ruled correctly.

■■ Although it is clear that hearsay declarations of a conspirator are admissible against his co-conspirators if made in the course of and in furtherance of the conspiracy, Lutwak v. United States, 344 U.S. 604, 617 (1953); Clune v. United States, 159 U.S. 590, 593 (1895), it likewise is clear that there must be independent evidence establishing a defendant's participation in the conspiracy before such declarations are admissible against him. Glasser v. United States, 315 U.S. 60, 74 (1942). Moreover, it is well settled in this Circuit that the trial judge must make this preliminary determination. United States v.

Geaney, 417 F.2d 1116, 1119 (2 Cir.), cert. denied, 397 U.S. 1028 (1969); United States v. Dennis, 183 F.2d 201, 230–31 (2 Cir. 1950), aff'd, 341 U.S. 494 (1951); United States v. Pugliese, 153 F.2d 497, 500 (2 Cir. 1945); United States v. Nardonne, 127 F.2d 521, 523 (2 Cir.), cert. denied, 316 U.S. 698 (1942). To satisfy the threshold test of admissibility, the government must show by "a fair preponderance of the evidence independent of the hearsay utterances" that the accused associated himself with the mutual venture. United States v. Geaney, *supra*, 417 F.2d at 1120; accord, United States v. Calarco, 424 F.2d 657, 660 (2 Cir. 1970).

In the instant case, there was sufficient evidence to support the trial court's ruling that the government had satisfied this threshold test of admissibility. During the course of the alleged conspiracy, Villanueva and Puga met with the undercover agents on a number of separate occasions. On almost every occasion, Calabro was present or in close proximity to them when discussions regarding sales of narcotics occurred. Moreover, at the most critical junctures of the conspiracy, Villanueva met with Calabro immediately prior to her meetings with the agents. On August 11, she conversed with Calabro fifteen minutes before her rendezvous with Boccia to consummate the sale of one kilogram of heroin. On August 19, Villanueva and Calabro were seated together at the bar moments before Villanueva asked Boccia if he wanted to purchase more narcotics. Similarly, on September 16, Villanueva met with Calabro minutes before her meeting with Boccia to discuss the sale of a second kilogram of heroin. The trial court's preliminary determination that Calabro participated in the conspiracy is further supported by Calabro's

---

3. Judge Motley initially seems to have ruled that Villanueva's declarations did not constitute hearsay, but were "verbal acts". In denying Calabro's motion for acquittal, however, Judge Motley considered Calabro's argument that there was insufficient independent evidence of a conspiracy and ruled that Calabro was

shown to be a member of the conspiracy by a fair preponderance of the evidence independent of the hearsay utterances. We believe that Judge Motley made the requisite preliminary determination that Villanueva's declarations were admissible against Calabro.

scrutiny of the agents, by his close observation of critical discussions between the agents and Villanueva and Puga, and —of critical importance—by the frisking of Boccia, either by Calabro or by his colleague in Calabro's presence. The trial court was entitled to infer that the purpose of this conduct on the part of Calabro was to assure himself that it was safe to do business with Boccia. While this is a close case, we hold that there was sufficient independent, non-hearsay evidence to support the trial court's finding that Calabro had "associate[d] himself with the mutual venture." United States v. Peoni, 100 F.2d 401, 402 (2 Cir. 1938).

■ It is true that almost every aspect of Calabro's conduct is susceptible of an inference other than his participation in the conspiracy. However, as Judge Friendly observed in United States v. Geaney, *supra*, 417 F.2d at 1121, "Pieces of evidence must be viewed not in isolation but in conjunction." A seemingly innocent act, when viewed in the context of surrounding circumstances, may justify an inference of complicity. The combination of Calabro's presence at almost every meeting between Villanueva and the agents, of his meeting with Villanueva immediately before her crucial meetings with the agents, and of his conduct in attempting to satisfy himself that Boccia was trustworthy is not likely to be a mere coincidence. Here, as in United States v. Monica, 295 F.2d 400, 401 (2 Cir. 1961), cert. denied, 368 U.S. 953 (1962), "each of the . . . episodes gained color from each of the others." Calabro's role in this conspiracy was one of wile which alone might not establish complicity; but in the context of this record we are left with the firm conviction that it was precisely Calabro's wile that made this conspiracy click. We conclude that the independent evidence permitted the inference that Calabro had associated himself with the continuing venture.

Moreover, Calabro's conduct distinguishes this case from our decisions holding that mere association with an alleged conspirator, without more, is insufficient to establish the necessary foundation for the admissibility of incriminating statements. United States v. Cimino, 321 F.2d 509, 510 (2 Cir. 1963), cert. denied, 375 U.S. 974 (1964); United States v. Bentvena, 319 F.2d 916, 949 (2 Cir.), cert. denied sub nom. Mirra v. United States, 375 U.S. 940 (1963); United States v. Stromberg, 268 F.2d 256, 267 (2 Cir.), cert. denied sub nom. Lessa v. United States, 361 U.S. 863 (1959). For example, in United States v. Cimino, *supra*, 321 F.2d at 510, the independent evidence of an accused's participation in a conspiracy consisted of two meetings with an alleged conspirator. And in United States v. Bentvena, *supra*, 319 F.2d at 949, the sole independent evidence available to connect the defendants with a conspiracy was the presence of a phone number in an alleged conspirator's phone book. Here we have no difficulty in finding that Calabro's omnipresence and his attempting to assure himself of the agents' trustworthiness constituted more than mere association with Villanueva and Puga.

■ Finally, Calabro's reliance on such cases as United States v. Euphemia, 261 F.2d 441 (2 Cir. 1958), and United States v. Cantone, 426 F.2d 902 (2 Cir.), cert. denied, 400 U.S. 827 (1970), is misplaced. Those cases dealt with the quantum of proof necessary to warrant submission of a conspiracy charge to the jury. However, it is clear that the test of "a fair preponderance of the evidence" established by United States v. Geaney, *supra*, 417 F.2d at 1120, can be satisfied by a lesser amount of proof than is required to justify submission of a conspiracy charge to the jury. As we said in United States v. Ross, 321 F.2d 61, 68 (2 Cir.), cert. denied, 375 U.S. 894 (1963), "the amount of proof *aliunde* as to the existence of a conspiracy that is required to render such evidence admissible is not as high as the amount needed to warrant submission of a conspiracy charge to the jury." And in United States v. Ragland, 375 F.2d 471, 477 (2 Cir. 1967), cert. denied, 390 U.S.

925 (1968), Judge Waterman wrote that "the threshold requirement for admissibility is satisfied by a showing of a likelihood of an illicit association between the declarant and the defendant although it might later eventuate that evidence so admitted proves to be insufficient to justify submitting to the jury the issue of defendant's alleged guilty involvement with the declarant." *Accord,* United States v. Borelli, 336 F.2d 376, 387 (2 Cir. 1964), cert. denied sub nom. Mogavero v. United States, 379 U.S. 960 (1965).

### III.

Calabro and Puga claim that the evidence was insufficient to prove the requisite knowledge of illegal importation of the heroin. This claim is without merit.

■ In order to convict a defendant of concealment, transportation or sale of illegally imported narcotics under 21 U.S.C. § 174 (1964), the government must prove that he knew the narcotics to have been illegally imported. Actual knowledge of illegal importation may be proven by either direct or circumstantial evidence. United States v. Nuccio, 373 F.2d 168, 174 (2 Cir.), cert. denied, 387 U.S. 906 (1967); United States v. Agueci, 310 F.2d 817, 828 (2 Cir. 1962), cert. denied, 372 U.S. 959 (1963).

■■ In the case of Puga (who was convicted on the conspiracy count only),[4] there was sufficient circumstantial evidence to support a finding that he knew the heroin had been illegally imported. The evidence tended to show that Puga was a central figure in the conspiracy. He was present at the introduction of Boccia to Villanueva and at the ensuing discussion of the narcotics traffic in New York; he knew of the August 11 sale to Boccia even though he was not present when it was made; he also knew

the identity of Villanueva's sources and the quality of merchandise they could provide; he defended the quality of the heroin that he and Villanueva could provide; and, finally, Puga was able to assure Boccia of the availability of large quantities of heroin for future purchases and, together with Villanueva, was able to make good on that boast even on short notice and at a time the drug was in short supply. Puga's entire course of conduct during the conspiracy impels the conclusion that he was intimately acquainted with the details of the mutual venture in selling, concealing and transporting narcotics. From this, the jury reasonably could have concluded that Puga knew the heroin to have been illegally imported.

■ Assuming that the evidence were insufficient to show actual knowledge, the government satisfied this statutory element by relying upon the presumption of 21 U.S.C. § 174 (1964), which provides that the unexplained possession of narcotics shall be deemed sufficient evidence of illegal importation. The government did not have to show physical possession to invoke this presumption; a showing of constructive possession through the exercise of dominion and control over the narcotics was sufficient. United States v. Hysohion, 448 F.2d 343, 347 (2 Cir. 1971); United States v. Febre, 425 F.2d 107, 111 (2 Cir.), cert. denied, 400 U.S. 839 (1970); United States v. Rivera, 346 F.2d 942 (2 Cir. 1966); United States v. Carter, 320 F. 2d 1 (2 Cir. 1963); United States v. Jones, 308 F.2d 26, 30 (2 Cir. 1962) (en banc); United States v. Hernandez, 290 F.2d 86, 90 (2 Cir. 1961). In United States v. Jones, *supra,* 308 F.2d at 30, we said that "one having a working relationship or a sufficient association with those having physical custody of the drugs so as to enable him to assure their production, without difficulty, to a

---

4. The same specific knowledge by the defendant that the drug was illegally imported is also an essential element of the conspiracy to violate 21 U.S.C. §§ 173 and 174 (1964). United States v.

Hysohion, 448 F.2d 343, 347 (2 Cir. 1971); United States v. Puco, 436 F.2d 761, 762–63 (2 Cir. 1971); Jefferson v. United States, 340 F.2d 193, 197 (9 Cir. 1965).

customer as a matter of course may be held to have constructive possession."

■ In the instant case, the evidence warranted the jury's finding that Puga had "a working relationship" with his suppliers "which would enable him to assure delivery." United States v. Hernandez, *supra*, 290 F.2d at 90. The evidence supported the inference that through the concerted action of Villanueva and Puga one kilogram of heroin was available for Agent Boccia to purchase on August 11. The finding of constructive possession is further supported by the permissible inference that the combined efforts of Villanueva and Puga resulted in the availability of at least one kilogram of heroin for sale to Boccia on September 16. The finding of constructive possession is amply supported by Puga's ability to deliver large quantities of heroin on short notice because of his "working relationship" with Calabro and other heroin suppliers. United States v. Jones, *supra*, 308 F.2d at 30; United States v. Hernandez, *supra*, 290 F.2d at 90.

In the case of Calabro, having held that the Villanueva statements were properly admitted, it follows that there was sufficient evidence to support an inference of constructive possession on the part of Calabro. On two separate occasions, Villanueva referred to Calabro as her source of heroin for the sale on August 11. On two other occasions, Villanueva indicated that Calabro was a possible source of heroin. Villanueva's declarations, coupled with Calabro's omnipresence and his conduct in assessing Boccia's trustworthiness, entitled the jury to find that Calabro supplied the heroin sold to Boccia on August 11 and that Calabro, Villanueva and Puga were engaged in a mutual venture in which Calabro supplied Villanueva and Puga with narcotics. From his role as supplier, the jury logically could have inferred that Calabro had a "working relationship" with Villanueva and Puga which enabled him "to control the disposition of drugs" and that Calabro

therefore had constructive possession of narcotics. United States v. Jones, *supra*, 308 F.2d at 30.

### IV.

Calabro, Puga and Villanueva each argue that the evidence failed to establish the single conspiracy charged in the indictment. They contend that the evidence at best established two distinct conspiracies and that the trial court failed to furnish the jury with intelligible criteria for determining whether more than one conspiracy existed. These contentions are without merit.

■ The evidence clearly permitted the inference that the three appellants participated in a single conspiracy, with Calabro supplying Villanueva and Puga with narcotics to be sold to various purchasers.

Villanueva's own declarations prove that she was a participant in the conspiracy from her first meeting with Scrocca in Miami on July 17 to the time of her efforts to consummate a second sale on September 16; and Puga's and Calabro's involvement with her provided sufficient evidence for the jury to link Puga and Calabro to the single conspiracy charged.

The evidence supports the inference that Puga's participation in the conspiracy dated from his introduction to Boccia and Ellin on August 3. The fact that Puga was in Miami at the time of the sale on August 11 does not establish that he joined the conspiracy sometime after that date. On August 3, he had discussed the narcotics trade in New York with Boccia and Ellin. On August 19, Puga knew about Boccia's purchase, and was able to assure Boccia that any heroin supplied in the future would be of a quality similar to that purchased on August 11. In addition, Puga's presence and statements at the scene of the abortive sale on September 16 indicate that his participation in the conspiracy continued to that date.

Calabro's participation in the conspiracy began at least when Villanueva first

identified him as her supplier on July 17. Moreover, his involvement with Villanueva indicates that he continued to participate in the conspiracy until September 16. On August 19, Villanueva was conversing with Calabro moments before she asked Boccia if he wanted to purchase more heroin. Villanueva also met with Calabro on September 15, after she had told Boccia that an Italian was one of her sources of heroin. Finally, on September 16, Villanueva said that she had asked Calabro for heroin but that he had not been able to supply her with any.

Appellants' continuous involvement with each other provided the common thread upon which the jury properly could find the single conspiracy charged. See United States v. Cobb, 446 F.2d 1174, 1177 (2 Cir. 1971); United States v. Baker, 419 F.2d 83, 88 (2 Cir.), cert. denied, 397 U.S. 971 (1969); United States v. Nuccio, 373 F.2d 168, 170 (2 Cir.), cert. denied, 387 U.S. 906 (1967); United States v. Agueci, 310 F.2d 817, 826 (2 Cir. 1962), cert. denied, 372 U.S. 959 (1963).

■ Appellants' claim that the charge on the issue of multiple conspiracies was erroneous is premised on the assumption that there was evidence from which the jury could infer that there were two separate conspiracies. A careful examination of the evidence, however, shows this to be not so. We are satisfied that there was no evidence upon which the jury could find two conspiracies. If the agents' testimony was believed, the jury was compelled to find the single conspiracy charged. It is true that the existence of multiple conspiracies generally is a question for the jury. United States v. Dardi, 330 F.2d 316 (2 Cir.), cert. denied, 379 U.S. 845 (1964); United States v. Crosby, 294 F.2d 928 (2 Cir. 1961), cert. denied, 368 U.S. 984 (1962). But a trial court is not required to charge on the issue of multiple conspiracies in every case where such a request is made. Under the circumstances of this case, we hold that it was not necessary to instruct the jury on the issue of multiple conspiracies. Not being entitled to such a charge, at worst appellants suffered only harmless error if, as they claim, the charge given failed to articulate intelligible criteria for determining whether more than one conspiracy existed. United States v. Guidice, 425 F.2d 886, 890 (2 Cir. 1970); United States v. Mingola, 424 F.2d 710, 713 (2 Cir. 1970); United States v. Ragland, 375 F.2d 471, 479 (2 Cir. 1967), cert. denied, 390 U.S. 925 (1968).

■ Assuming that appellants were entitled to a charge on the issue of multiple conspiracies, the trial court's charge was not erroneous. They claim that the charge failed to comply with the standards established by United States v. Kelly, 349 F.2d 720 (2 Cir.), cert. denied, 384 U.S. 947 (1966), and United States v. Borelli, 336 F.2d 376 (2 Cir. 1964), cert. denied sub nom. Mogavero v. United States, 379 U.S. 960 (1965). We find that the trial court substantially complied with the requirements of these cases.

*Kelly* requires that the jury clearly recognize the difference between the evidence against each defendant. 349 F.2d at 757. In the instant case, the trial court properly instructed the jury to consider the proof against each defendant individually and explained the evidence upon which the government relied to connect each defendant to the conspiracy. This simple case is about as far removed as can be imagined from *Kelly*. There is no reason to believe that the jury here could not distinguish the evidence to be considered against each defendant. See United States v. Guanti, 421 F.2d 792, 800–01 (2 Cir.), cert. denied, 400 U.S. 832 (1970); United States v. Nuccio, *supra*, 373 F.2d at 174.

Likewise we find that the trial court substantially complied with *Borelli*. There we held that "where the evidence is ambiguous as to the scope of the agreement made by a particular defend-

ant and the issue has practical importance, the court must appropriately focus the jury's attention on the issue rather than allow it to decide on an all or nothing basis as to all defendants." 336 F.2d at 386 n. 4. Here the trial court did discuss the evidence against each defendant. There was little ambiguity as to the scope of the agreement made by each defendant. Moreover, the trial court directed the jury's attention to the government's contention that there was a single conspiracy proved and that appellants contended there were two conspiracies. Finally, the court instructed the jury that they could convict some, all or none of the defendants. Thus the charge given was not the all or nothing charge condemned in *Borelli*. See United States v. Guanti, *supra*, 421 F.2d at 800–01.

 Appellants' main objection to the charge in this respect is that the trial court refused to instruct the jury that they must acquit appellants if they found two conspiracies rather than the one charged. Appellants argue that the court's failure to charge as requested made it likely that the jury would return a guilty verdict even if they found two conspiracies. However, an examination of the entire charge satisfies us that this claim is without merit. The court stressed that the government alleged a single conspiracy, and added that the government must show that each defendant was a knowing part of it. Moreover, this case presented a relatively simple factual pattern which is not likely to have confused the jury. We find no basis for believing that the jury thought that it might convict if it found multiple conspiracies. While it is better practice to instruct the jury that they must acquit if they find multiple conspiracies when only one conspiracy is charged, we hold that the failure to do so here was not reversible error. See United States v. Aiken, 373 F.2d 294, 299 (2 Cir.), cert. denied, 389 U.S. 833 (1967).

Affirmed.